Rodney MCINTOSH, Plaintiff,

v.

STANLEY–BOSTITCH,
INC., Defendant.

No. C2–098–372.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 26, 2000.

---

5. The work force was approximately 80% female.

Patrick J. Piccininni, Brunner & Brunner, Columbus, OH, Jeffrey C. Pettys, Reed & Pettys, Columbus, OH, for plaintiff.

Gary Edward Becker, Dinsmore & Shohl, Cincinnati, OH, Michael J. Stief, III, Pittsburgh, PA, Eric T. Prozzi, Jackson, Lewis, Schnitzler & Krupman, Pittsburgh, PA, for defendant.

## I. INTRODUCTION

MARBLEY, District Judge.

This matter is before the Court on the Defendant's, Stanley–Bostitch, Inc., Motion for Summary Judgment. The Plaintiff, Rodney McIntosh, has brought suit claiming that the Defendant demoted and terminated him based on his handicap and age in violation of Ohio law, Ohio Revised Code Chapter 4112.. For the following reasons, Defendant's Motion is **DENIED** in part and **GRANTED** in part.

## II. FACTS

The Defendant's version of the facts differ greatly from the Plaintiff's. The uncontroverted facts are as follows. The Plaintiff was hired as a sales representative for the Defendant in 1977 and worked in the Defendant's wood fastening division from 1981 to 1994. In 1994, the Defendant announced that it was going to combine its wood fastening and industrial sales divisions. Jack Biddick, Vice President of Operations, became the head of the newly titled Direct Sales force. In August of 1994, Biddick chose the Plaintiff to be the Regional Sales Manager for the Mid–West Region of Direct Sales. Biddick was the Plaintiff's direct supervisor and supervised all ten Regional Sales Managers.

The Plaintiff suffered from a life-threatening brain hematoma and had surgery on January 28, 1996. Following his surgery, the Plaintiff took approximately six weeks off from work. On March 12, 1996, Biddick met with the Plaintiff at the Holiday Inn at the Columbus Airport to discuss his employment status. At the meeting, Biddick demoted the Plaintiff to the position of sales associate. Four days after that meeting, the Plaintiff began working as a sales associate, taking over territory previously held by Mike White. On March 27, 1997, the Plaintiff was terminated from his employment with the Defendant.

Aside from these facts, there are two distinct versions of the events that lead up to the Plaintiff's demotion and eventual termination.

### A. *The Plaintiff's Demotion.*

#### 1. *Performance Issues.*

The Defendant claims that in 1995, Biddick began to see problems with the Plaintiff's performance. Specifically, Biddick claims that the Plaintiff had difficulty understanding how the compensation program worked for the sales associates, had difficulty understanding his region's sales numbers, could not articulate how he was going to get his region back on target, was unable to hold his sales associates accountable for their results, did not provide leadership and could not adjust to accounts that were previously serviced by the industrial division. In addition, the Plaintiff's region was not meeting its sales and profits budget.

In 1995, during a phone conversation, Biddick claims he told the Plaintiff that if he did not improve that he would be removed from his position. Specifically, in May of 1995, Biddick gave the Plaintiff a performance evaluation in which his deficiencies were discussed. Also in 1995, Biddick talked with James McClellan, National Accounts Manager, and Rick Wontka, the head of the human resource department, about the Plaintiff's performance problems.

The Plaintiff controverts the Defendant's version of the facts by stating that Biddick did not speak to him about performance problems before he was demoted.

The Defendant claimed that the Plaintiff was demoted, for one, because he could not apply his sales skills to the larger and more complex industrial customer base. However, the Plaintiff states that Biddick did not document this in his six month interim performance review, dated May 26, 1995.

The Plaintiff also denies that he failed to pursue aggressively new industrial account sales, as he successfully opened the first Redman Homes account, which was noted in his interim performance review. The Plaintiff received a favorable review in December of 1995, and in a written memo attached to the review, dated May 26, 1995, Biddick praised the Plaintiff's performance.

The Plaintiff also contends that the performance review for the 1995 sales year is a complete fabrication. Its style is completely different from the forms used by the Defendant, it was not dated; and the Plaintiff did not receive a copy. Biddick states that he created the review on his laptop computer but does not remember when or where he created it, and that after he created it, he threw it away. A copy of the review, however, was found in the Plaintiff's personnel file.

### 2. McClellan's Move to Ohio.

By mid-December of 1995, Biddick had determined that he was going to remove the Plaintiff from his Regional Sales Manager position and place him in a sales associate position. Biddick claims that he was also planning to offer the Plaintiff the option of resigning with a severance package. At the time, Biddick contends that he asked Jim McClellan, who was working in Rhode Island, if he would be interested in relocating to Ohio to take over the job of Regional Sales Manger. Biddick supports his story by stating that he met with Wontka to discuss his decision to remove the Plaintiff from the Regional Sales Manager position. Biddick wanted the demotion to take place immediately, but Wontka

convinced him not to make the change until after the 1995 winter holidays.

Biddick did not terminate the Plaintiff during the month of January 1996, because he was busy. In mid-January, however, Biddick claims he officially offered the position to McClellan, and told him to start making arrangements to move to Ohio. McClellan put his home up for sale in Rhode Island and traveled to Columbus on January 25, 1996, to look for a new house. He put an offer on a house in Ohio, on January 28, 1996, and returned to Rhode Island on January 29, 1996.

After the Plaintiff suffered from a brain hematoma and had surgery on January 28, 1996, McClellan was temporarily placed in-charge of the Plaintiff's region. Biddick provides that McClellan's new position was only temporary because he did not want to demote the Plaintiff while he was recuperating from surgery.

The Plaintiff points out that McClellan's performance review states that he was promoted to Regional Sales Manager in March of 1996. In addition, McClellan wrote on his mortgage application, dated January 28, 1996, that he was employed as a National Accounts Manager, and not as a Regional Manager.

The Plaintiff contends that the real story behind McClellan's move to Ohio was that he was going to replace White as a sales associate. In July of 1995, while the Plaintiff was a Regional Manager, White struck and killed a Columbus police officer with his car. The Plaintiff called Biddick about White's accident, told him that he wanted to terminate White, and asked Biddick if he could find a replacement. White's termination was put on hold after Wontka told Biddick and the Plaintiff to "build a book" on White to avoid employment discrimination claims based on White's age.[1]

In October of 1995, the Plaintiff called Biddick and asked him if he had found

---

**1.** According to the Plaintiff, "building a book" was a term used by Defendant's management. It meant documenting false performance is-

sues or willfully exaggerating performance problems in an effort to build a non-discriminatory defense to a potential wrongful termi-

someone to replace White. Biddick said that the person he had in mind was interested in returning to Ohio. McClellan is from Ohio and is an Ohio State University graduate. The Plaintiff believes that McClellan was the individual that Biddick had in mind for White's position.

In addition, the Plaintiff points to several inconsistent actions taken by Biddick which indicate that Biddick had not decided to replace the Plaintiff before he went in for surgery. First, Biddick wrote the Plaintiff a letter on December 26, 1995, explaining his 1996 compensation as a Regional Sales Manager. In that letter, Biddick stated, "Best wishes for a great 1996. I am counting on your team's top performance." In January of 1996, the Plaintiff received another letter regarding his 1996 compensation as Regional Sales Manager. During the month of January, Biddick sent the Plaintiff a formal compensation contract, which the Plaintiff signed and returned on January 3, 1996. Biddick also asked the Plaintiff to attend the company's Regional Sales Managers meeting in January of 1996, which was to take place in Rhode Island during the first week of February 1996. The Plaintiff purchased airline tickets and made hotel reservations to attend this meeting, at the expense of the Defendant, however the Plaintiff did not attend because of his illness.

B. *The Plaintiff's Meeting with Biddick.*

On February 12, 1996, the Plaintiff met with his physician, Dr. Fleming. Dr. Fleming told the Plaintiff that he could return to office work, but that he should not be driving on the road. Dr. Fleming said that in about a month he would see the Plaintiff again and that, at that time, he would probably be able to return to "full work." The Plaintiff went to his doctor again on March 11, 1996.

On March 12, 1996, Biddick met with the Plaintiff at the Holiday Inn at the Columbus Airport to discuss his employment status.[2] At that time, the Plaintiff claims he discussed his medical condition and his physical appearance with Biddick. The Plaintiff's head was still shaved from the surgery, he had marks on his head from three large drill holes, his scalp had noticeable stitch holes, and he had dark bags under his eyes. Plaintiff states that he told Biddick that he could start back to work with half days and then full time when his strength returned. The Plaintiff told Biddick that he could not drive for a few months because there was a possibility that he would have a seizure while driving. The Defendant counters that the Plaintiff never told Biddick or McClellan that he was placed under driving restrictions as of March 1996.

The Plaintiff says that Biddick told him that "because of his health problems, it would be best for the company and best for [the Plaintiff] if he were demoted to the position of Sales Associate."[3]

The Defendant recalls that he offered the Plaintiff the option of either moving into a sales territory presently occupied by

nation lawsuit. In their depositions, Biddick and Wontka said they understood the meaning of the term.

In its Reply, the Defendant states that the Plaintiff mischaracterized Biddick and Wontka's testimony about "building a book." The Defendant states that Biddick testified that Regional Managers would talk about "building a book" if they had a disciplinary situation but that he had not used the term himself. Wontka did not recall the terminology being used.

2. The Plaintiff thought that he was meeting with Biddick to receive his fiscal 1995 performance review.

3. In the Plaintiff's deposition, he changed Biddick's statement from what was originally plead in his Complaint. In his Complaint, the Plaintiff recalled that Biddick said that he had to get the region going and that given his situation it would be best for the company if the Plaintiff were demoted to the position of sales associate. In his deposition, the Plaintiff quoted Biddick as stating that "because of his health problems, it would be best for the company and best for [the Plaintiff] if he were demoted to the position of Sales Associate."

White or resigning with a severance package, while in contrast the Plaintiff does not recall being offered a severance package at the meeting. The Defendant states that White's territory was chosen so that the Plaintiff would not have to relocate. The Plaintiff chose to accept White's sales territory, and four days after the meeting, the Plaintiff began working as a sales associate.

The Plaintiff states that the sole reason he was given for being demoted was that he did not reach his sales budget. The Plaintiff does not dispute this fact. The Plaintiff supplements the Defendant's reason by pointing out that he was one of eight Regional Sales Managers who failed to reach their budget but that he was the only one who was demoted or terminated. For example, Regional Sales Managers, Dale Trowe and Roy Plummer, were not terminated for failing to meet their sales budgets in 1995. And, in 1995, the company's sales were below budget and goal. Only two out of ten Regional Sales Managers reached their sales budget for the year and no Regional Sales Managers reached their gross profit goal. The Plaintiff ranked number five out of ten for all Regional Sales Managers in obtaining their sales budgets for 1995.

In distinguishing the Plaintiff's termination from Trowe's and Plummer's, Biddick testified that he did not terminate or demote either Trowe or Plummer because he had confidence in their strategic plans. In December of 1995, the strategic plans for all Regional Sales Managers were located in their personnel files. Biddick testified that he reviewed all of the strategic plans in 1995 to complete the performance reviews for all ten of his Regional Managers. The strategic plans for the Regional Sales Managers have since disappeared.[4]

C. *The Plaintiff's Termination.*

Biddick and McClellan met with White in another hotel room in the Holiday Inn on March 12, 1996, to terminate him. White asked if he could stay on the payroll because continued employment would help his legal predicament. Biddick granted White's request and decided to use the time to have White introduce the Plaintiff to his new sales territory. White introduced the Plaintiff to his former customers for three to four weeks. In contrast, the Plaintiff claims that White was retained by the Defendant so that he could drive the Plaintiff to his customer's locations as he was unable to drive.

Almost immediately, McClellan began to notice that the Plaintiff was having performance problems as a sales associate. Despite this fact, McClellan took a "hands-off" approach to the Plaintiff for about four months because he assumed that the Plaintiff knew what to do as a sales associate as he was the ex-Regional Sales Manager.[5] McClellan brought the Plaintiff's performance problems up with Wontka and wrote to the Plaintiff in 1996 and 1997 about the concerns he had. Specifically, McClellan noted on October 21, 1996, that the Plaintiff was at the bottom of the region in performance to sales budget. On December 12, 1996, McClellan again wrote the Plaintiff regarding his sales performance. McClellan had not seen improvement since October, and he was concerned that the Plaintiff was only targeting pallet accounts and was not looking to other markets. McClellan told the Plaintiff that if his performance did not improve that he would be terminated. On January 30, 1997, McClellan wrote the Plaintiff and told him that his territory finished last in the region for sales budgets in 1996. Again, McClellan warned that a failure to improve would result in termination. On February 4, 1997, McClellan wrote the

4. The only individuals with access to the Regional Sales Manager's personnel files were Biddick and his file clerk.

5. McClellan spent time with other sales associates who were struggling to meet their 1996 goals, but did not help the Plaintiff despite the fact that he was working in one of the region's worst territories.

Plaintiff because he was concerned that the Plaintiff did not understand the compensation program.

In the Plaintiff's 1996 performance evaluation, McClellan wrote that the Plaintiff had a "terrible overall year with respect to attainment of sales and gross profit budgets and new business," "was the worst in the region with respect to sales and gross profit budget attainment, as well as sale growth over the prior year," "was the second worst in the region with respect to new business," "banked his efforts to grow on sales on a handful of pallet accounts," and "did not aggressively attack other markets and did not close an account outside of the pallet market."

McClellan wrote Biddick on March 11, 1997, concerning his desire to terminate Plaintiff's employment. Biddick reviewed the information with Wontka and they concluded that termination was appropriate. The Plaintiff was terminated on March 27, 1997.

According to the Plaintiff, when he took over for White, the sales territory was performing poorly and had been neglected because of White's alcohol and legal problems. White had lost customers and had strained customer relations. Because of the territory he was assigned, the Plaintiff states that the Defendant knew that he would have a difficult time achieving his sales budget in 1996. The Plaintiff states that the Defendant also knew that by placing the Plaintiff in White's territory that the Defendant could document the Plaintiff's performance problems and "build a book" on him, with the goal of terminating him.

The Plaintiff also points out that he did not become accountable for his sales territory until May 1, 1996, and that White received credit for all of the sales that occurred during his three to four week orientation. Because White's sales territory was in disarray, the Plaintiff claims that he had to spend time repairing customer relations, working to maintain existing relations and working to maintain and develop business contacts. The Plaintiff admits to receiving letters of reprimand from the beginning of his employment as a sales associate. The Plaintiff thought it was clear that the company was "building a book" against him, and supports his position by pointing to a letter that McClellan wrote to Biddick asking him what he needed to do to "substantiate" the reasons for the Plaintiff's termination.

The Plaintiff does not dispute that his sales figures were below target for 1996, but disputes the assertion that his sales performance was poor. By the end of 1996, the Plaintiff had increased his territory's total sales by 1.6%, which was accomplished in less than nine months. For the first three months of 1997, the Plaintiff began to show significant sales growth and met his monthly budget for the month of January 1997. The Plaintiff also points to the fact that the Defendant employed nearly one hundred sales associates throughout the company, that he performed better than twenty-six of them, but that he was the only one who was terminated.

Shortly before the Plaintiff was discharged, the Plaintiff contends that he experienced an episode of confusion and dizziness while driving back to Columbus, Ohio. These were the same symptoms he experienced before his surgery in 1996. The Plaintiff was unable to remember his phone number, the phone number of the Defendant, or the number of his doctor. Later the next day, the Plaintiff called his doctor and scheduled an appointment. At that time the Plaintiff claims to have called McClellan to tell him that he might need time off from work. The Plaintiff states that McClellan replied by saying "that's interesting;" however, McClellan denies receiving the phone call. Biddick, McClellan and Wontka no longer work for the Defendant.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (summary judgment appropriate when the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating such a motion, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *See Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

## IV. DISCUSSION

### A. *Handicap Discrimination.*

Just as the Defendant's version of the facts vary greatly from the Plaintiffs, so do their theories of the case. The Plaintiff claims that this is a case of direct evidence of handicap discrimination, while the Defendant claims that this is one of indirect evidence. The Court will first examine whether direct evidence of handicap discrimination exists.

Direct evidence "[r]efers to a method of proof, not a type of evidence. It means that a plaintiff may establish a prima facie case of [handicap] discrimination directly by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent." *Mauzy v. Kelly Serv., Inc.,* 75 Ohio St.3d 578, 664 N.E.2d 1272 (1996) (syllabus).[6] The Sixth Circuit has noted that direct evidence, in the form of verbal comments, will be along the lines of an employer stating that " 'I fired you because you are disabled.' " *Kvintus v. R.L. Polk & Co.,* 3 F.Supp.2d 788, 793 n. 2 (6th Cir.1999) (citing *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir.1998)). In analyzing discriminatory comments, factors to consider include whether a decision maker or an agent made the comment, whether the comment was related to the decision-making process, and whether the comment and the discriminatory act were close in time. *See Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1330 (6th Cir. 1994); *Byrnes v. LCI Communication Holdings Co.,* 77 Ohio St.3d 125, 672 N.E.2d 145, 149 (1996) (finding that there "[m]ust be a link or nexus between the discriminatory statement or conduct and the prohibited act of discrimination to establish a violation of the statute."). "[U]nder Ohio law ... even if direct evidence allows a plaintiff to escape the burden-shifting approach, the plaintiff still bears the burden of persuasion that [an improper factor] was the cause of the adverse employment action." *Bush v. Dictaphone Corp.,* 161 F.3d 363, 370 (6th Cir.1998).

---

**6.** The Sixth Circuit stated in *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1081 (6th Cir.1994), that evidence that would require the jury to infer a fact is not direct evidence. Direct evidence is where an employer's statement directly shows discriminatory motive. *Schlett v. Avco Fin. Servs., Inc.,* 950 F.Supp. 823, 828 (N.D.Ohio 1996).

■ Once the Plaintiff establishes direct evidence, the burden of persuasion shifts to the defendant to show that it would have taken the same adverse employment action had it not been motivated by discrimination. *See Jacklyn v. Schering–Plough Healthcare Prod. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality); *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1081 (6th Cir. 1994); *Harrison v. Olde Fin. Corp.* 225 Mich.App. 601, 572 N.W.2d 679, 683–84 (1997)).

■ The Plaintiff argues that this is a case of direct evidence. The direct evidence of discrimination on which the Plaintiff relies is Biddick's telling the Plaintiff that, "Rod ... I've got to get this region going ... [d]ue to your health problems, I feel it would be best for you and best for the company if I put you back into the territory. Because after you and I finish, I'm going to terminate Mike White." The Plaintiff contends that Biddick was meaningfully involved in the decision to demote and terminate the Plaintiff. Because there is direct evidence of discrimination, the Plaintiff argues that the burden shifting analysis of *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is inappropriate in this case.

In its Reply Memorandum, the Defendant refutes the Plaintiff's contention that this is a case of direct evidence. First, the Defendant argues that the evidence may not be used as direct evidence of the Plaintiff's termination because the comment was made during the time frame of the Plaintiff's demotion. Additionally, Biddick was not the decision maker behind the Plaintiff's termination. Next, the Defendant argues that there is no nexus between the statement and the adverse employment action, as McClellan had already visited Ohio to look for a home before the statement was made. The Defendant argues that McClellan's visit indicates that the decision to replace the Plaintiff was made before his illness.

Viewing this statement in the light most favorable to the Plaintiff, the Court finds that the comment constitutes direct evidence of discrimination. The comment is not far removed from the comment of "I fired you because you are disabled," and satisfies all three criteria for analyzing discriminatory comments. First, the comment was made by the decision maker who was behind the Plaintiff's demotion, Biddick. And even though Biddick did not terminate the Plaintiff, he did review McClellan's decision to do so. Second, the comment was directly related to the decision-making process and was, in fact, about the decision-making process. Biddick said that he was demoting the Plaintiff because of his health. And finally, the comment was made at the same time that the Plaintiff was demoted.

Furthermore, the Plaintiff argues that his demotion went hand-in-hand with his termination. The Plaintiff contends that he was given White's poorly performing sales territory so that the Defendant could "build a book" on him, document performance problems and eventually terminate him. Viewing the evidence in the light most favorable to the Plaintiff, the comment made by Biddick on March 12, 1996, can be attributed to the Plaintiff's termination in March of 1997.

Citing *Monette v. Electronic Data Systems Corporation,* 90 F.3d 1173, 1186 (6th Cir.1996), the Defendant argues that the Plaintiff must still demonstrate in a direct evidence case that he is disabled. The Plaintiff responds by contending that he was regarded as being disabled by his employer.

Ohio law defines "handicap" as:

[a] physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a

record of a physical or mental impairment; or *being regarded as having a physical or mental impairment.*

OHIO REV.CODE ANN. § 4112.01(A)(13) (emphasis added). To determine if the Plaintiff was handicapped, under the definition of the statute, the Court must determine if the Plaintiff was regarded as having a physical impairment that substantially limited one or more of his major life activities.

"Physical impairment" includes:

Any physiological disorder or condition ... affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitor-urinary; hemic and lymphatic; skin; and endocrine; ... [d]iseases and conditions, including, but not limited to, ... visual, speech, and hearing impairments, ...

OHIO REV.CODE § 4112.01(A)(16)(a)(i)–(iii).

A "major life activity" includes "[f]unctions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). "Substantially limits" means an inability to perform a class or a broad range of jobs, but does not mean the inability to perform a single job. *McKay v. Toyota Motor Mfg.,* 110 F.3d 369, 372 (6th Cir.1997) (citing 29 C.F.R. § 1630.2(j)(3)(i)).[7]

To determine if a major life activity is substantially limited, courts should look to "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2). Short-term or temporary restrictions are not substantially limiting. *See Roush v. Weastec, Inc.,* 96 F.3d 840, 844 (6th Cir.1996); *Laughlin v. United Telephone–Southeast, Inc.,* 1997

WL 87218, No. 96–5295, 1997 U.S.App. LEXIS 3822, at *12 (6th Cir. Feb. 27, 1997) (finding that the plaintiff was not disabled after he suffered a temporary back condition that required surgery where he had fully recovered at the time of his discharge); *Maloney v. Barberton Citizens Hosp.,* 109 Ohio App.3d 372, 672 N.E.2d 223, 225 (1996).

A plaintiff may also demonstrate that he was disabled if he or she is regarded as such by his or her employer. The " 'plaintiff must show that the perceived impairment is a substantial limitation on a major life activity.' " *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 885 (6th Cir.1996). *See also Green v. Rosemont Indus., Inc.,* 5 F.Supp.2d 568, 573 (S.D.Ohio 1998) (finding that the defendant must "regard" the impairment as substantially limiting).

As guidance, the Federal Regulations provide that an employee may show that he or she is regarded as being disabled if:

(1) has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(1).

Here, the Plaintiff argues that the Defendant regarded him as having a neurological impairment that substantially limited his ability to work. The Plaintiff had difficulty caring for himself, ambulating, speaking and comprehending. In March of 1996, Biddick did not know whether the Plaintiff's impairment would be temporary

---

**7.** Ohio courts look to cases decided under the Americans with Disabilities Act for assistance in interpreting Ohio law. *City of Columbus Civil Serv. Comm'n v. McGlone,* 82 Ohio St.3d

569, 697 N.E.2d 204, 207 (1998) (citing *Little Forest Med. Ctr. v. Ohio Civ. Rights Comm'n,* 61 Ohio St.3d 607, 575 N.E.2d 1164 (1991)).

or last an extensive period of time. Biddick did not ask the Plaintiffs about his condition.[8]

The Plaintiff contends that the Defendant regarded him as not being able to perform a broad range of jobs in that his demotion was tied to his termination. The Plaintiff argues that the Defendant placed the Plaintiff in White's sales territory knowing that his performance would be poor, so that it could build a book on him and terminate him shortly thereafter.

Based on the evidence, viewed in the light most favorable to the Plaintiff, the Court finds that the Defendant regarded the Plaintiff as having a handicap that substantially limited the major life activity of working. The Plaintiff's demotion and eventual termination demonstrate that the Defendant regarded the Plaintiff as not being able to participate in a broad range of jobs within the Defendant's company including the jobs of Regional Sales Manager and sales associate. The Plaintiff's life activity of working was substantially limited because the impairment, a brain hematoma, was severe, and the duration of the impairment was uncertain. Furthermore, the Plaintiff could not drive for several months and suffered a reoccurrence of dizziness and forgetfulness, of which the Defendant was aware, shortly before he was discharged in 1997.

As the Plaintiff has provided direct evidence of handicap discrimination, summary judgment on this claim must be denied. Since the Court has found that direct evidence of discrimination exists, it does not need to reach the question of whether indirect evidence of discrimination is present. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).

### B. *Age Discrimination.*

■ To establish a prima facie case of age discrimination under Ohio law, without direct evidence, a plaintiff must demonstrate: (a) that he or she was a member of the protected class, age forty and over; (2) that he or she was discharged; (3) that he or she was otherwise qualified for the position; (4) and that the successful candidate was outside of the protected class. *See Byrnes v. LCI Communication Holdings Co.*, 77 Ohio St.3d 125, 672 N.E.2d 145 (1996) (plurality opinion); *Mauzy v. Kelly Serv., Inc.*, 75 Ohio St.3d 578, 664 N.E.2d 1272, 1276 (1996); *Barker v. Scovill*, Inc., 6 Ohio St.3d 146, 451 N.E.2d 807 (1983) (syllabus).

While Ohio courts look to federal case law for assistance in interpreting claims of discrimination brought under the Ohio Revised Code, *see, e.g., Little Forest Med. Ctr. v. Ohio Civ. Rights Comm.*, 61 Ohio St.3d 607, 575 N.E.2d 1164 (1991), the question is unsettled as to what constitutes the prima facie elements of age discrimination in a case brought under the Ohio Revised Code vis-a-vis a case brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621.

On April 1, 1996, the United States Supreme Court decided *O'Connor v. Consolidated Coin Caterers Corporation*, 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), which modified the fourth element of a prima facie case of discrimination as established by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to include replacement by someone who is "substantially younger than the plaintiff." Following *O'Connor*, on June 12, 1996, the Ohio Supreme Court decided *Mauzy v. Kelly Services, Incorporated*, 75 Ohio St.3d 578, 664 N.E.2d 1272 (1996), an age discrimination case brought under the Ohio Revised Code. In laying out the elements of a prima facie case, in a footnote the court stated that "[t]he fourth element for the establishment of the prima facie case set forth herein is questionable in light of the recent United States Supreme Court deci-

---

8. To determine a reasonable accommodation, an employer may participate in "[a]n informal, interactive process with the qualified individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(*o*)(iii)(3).

sion of *O'Connor . . . ." Mauzy,* 664 N.E.2d at 1276 n. 2.

Then, on December 11, 1996, the Supreme Court of Ohio reviewed another age discrimination case, *Byrnes v. LCI Communication Holdings, Company,* 77 Ohio St.3d 125, 672 N.E.2d 145 (1996) (plurality opinion). In *Byrnes,* the court cited to one of its previous decisions, *Barker v. Scovill, Incorporated,* 6 Ohio St.3d 146, 451 N.E.2d 807 (1983), as the applicable standard for the prima facie elements of age discrimination under Ohio law. By citing to *Barker* in *Byrnes,* the Supreme Court of Ohio re-established as the fourth element of a prima facie case of age discrimination under Ohio law that the plaintiff "[w]as replaced by, or that his discharge permitted the retention of, a person not belonging to the protected class." *Byrnes,* 672 N.E.2d at 148.

Surprisingly, the Supreme Court of Ohio, in *Byrnes,* made no reference the United States Supreme Court's *O'Connor* decision. As already noted, in *O'Connor,* the Supreme Court modified the fourth element of an age discrimination case brought under the ADEA to include replacement by a "substantially younger" individual. *O'Connor,* 517 U.S. at 313, 116 S.Ct. 1307. Instead, the Supreme Court of Ohio, in *Byrnes,* reiterated the original prima facie elements of age discrimination which included replacement by an individual who is outside of the protected class of individuals.

While *Byrnes* was a plurality opinion and is not considered binding precedent, *State ex rel. Rouch v. Eagle Tool & Mach. Co.,* 26 Ohio St.3d 197, 498 N.E.2d 464, 481 n. 7 (1986) (dissent); *Progressive Casualty Ins. Co. v. Oakford,* 79 Ohio App.3d 97, 606 N.E.2d 1036, 1036 (1992), the syllabus of *Barker,* which has not been overruled, is binding precedent in Ohio. *See, e.g., Smith v. Klem,* 6 Ohio St.3d 16, 450 N.E.2d 1171 (1983) (finding that Ohio Supreme Court syllabus are binding precedent). Other courts reviewing the palpable conflict in *Mauzy* and *Byrnes* have adopted the prima facie elements for age discrimination

cases brought under Ohio law as established in *Barker* and followed by *Byrnes. See, e.g., Pasko v. American Nat'l Can Co.,* 998 F.Supp. 807, 811 (N.D.Ohio 1998); *Swiggum v. Ameritech Corp.,* No. 98AP-1031, 1999 WL 771022, 1999 Ohio App. LEXIS 4634, at *23-*24 (Ohio Ct.App. Sept. 30, 1999). Since this Court is required to defer to the State Court's interpretation of Ohio law, this Court will adopt the prima facie elements of age discrimination under Ohio law as established by *Barker* : "(1) that he was a member of the statutorily-protected class, (2) that he was discharged, (3) that he was qualified for the position, and (4) *that he was replaced by, or that his discharge permitted the retention of, a person not belonging to the protected class."* *Barker,* 451 N.E.2d at 808 (syllabus) (emphasis added).

■ Once this prima facie case has been established by the Plaintiff, the defendant must come forward with a legitimate non-discriminatory reason for the adverse employment action taken. *Barker,* 451 N.E.2d at 809. If the defendant provides such a legitimate non-discriminatory reason, the plaintiff must demonstrate that the employer's offered reasons were but a pretext for unlawful age discrimination. *See Scott v. Goodyear Tire & Rubber Co.,* 160 F.3d 1121, 1126 (6th Cir.1998); *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1082 (6th Cir.1994); *Barker,* 451 N.E.2d at 809.

In analyzing pretext, the Sixth Circuit has adopted the "permissive pretext" approach. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 344 (1997). "Under this method, if the plaintiff establishes that the Defendant's reasons are pretextual the trier of fact is permitted, but not required, to enter judgment for the plaintiff." *Kline,* 128 F.3d at 343.

■ An employee can show pretext in three different ways. The first way to show pretext is for the employee to offer

evidence that the employer's reason had no basis in fact. Second, the employee may argue that the reason was insufficient to warrant the adverse employment action, or third, the employee may offer evidence that the reason did not actually motivate the employer's decision. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 805–06 (6th Cir.1998); *Manzer*, 29 F.3d at 1084. Under the first two cases, the court may infer discrimination. *Manzer*, 29 F.3d at 1084. In the third type of case, where the plaintiff argues that the defendant's reasons did not motivate the adverse employment action, a plaintiff must come forward with additional evidence of discrimination. This type of case arises "[w]hen the plaintiff has failed to introduce evidence that the reasons offered by the defendant are 'factually false.' " *Id.* "When a plaintiff fails to factually challenge the reasons offered by the defendant, the plaintiff has failed to prove pretext and judgment for the defendant is warranted...." *Kline*, 128 F.3d at 346–47.

### 1. *Demotion.*

The Defendant argues that the Plaintiff has not established a prima facie case of age discrimination with regard to his demotion because the Plaintiff has not shown that he was qualified for the position of Regional Manager.

This Court finds that the Plaintiff has met all four of the elements needed to establish a prima facie case of age discrimination under the Ohio law. The Plaintiff, age fifty-three, was a member of the protected class,[9] who was demoted. Accepting the facts in the light most favorable to the non-moving party, the Plaintiff's 1995 performance reviews show that the Plaintiff was qualified for the position of Regional Sales Manager. As for the fourth prong, after his demotion, the Plaintiff was replaced by McClellan who was under the age of forty.

 The Defendant argues that it had a legitimate non-discriminatory reason for the action it took against the Plaintiff, that

is, he had numerous documented performance problems. The Plaintiff responded by arguing that the Defendant's reason is but pretext. The Plaintiff argues that the Defendant's reason for demoting him is not the true reason, and that his performance problems were insufficient to motivate his demotion. In support, the Plaintiff provides his 1995 performance reviews, the fact that other Regional Sales Managers were not demoted in 1995, for failing to meet their sales budgets, and the fact that other Regional Sales Managers received similar criticisms of their performance in 1995. Finally, as further evidence of pretext, the Plaintiff points to the allegedly fabricated performance review that was found in the Plaintiff's file and to the missing strategic plans.

The Plaintiff's rebuttal is based on the first and second methods of showing pretext, that is, that the Defendant's reason has no basis in fact and that the Plaintiff's performance problems were not sufficient to motivate the Plaintiff's demotion. In this instance, the Court may infer discrimination. The Court finds that the Plaintiff has rebutted the Defendant's legitimate nondiscriminatory reason and has shown pretext. Viewed in the light most favorable to the Plaintiff, the Plaintiff's 1995 performance reviews and the treatment of comparable Regional Sales Managers show that the Defendant's reasons had no basis in fact, and that his performance problems were insufficient to motivate his demotion. The Court therefore denies the Defendant's Motion for Summary Judgment on this claim.

### 2. *Termination.*

For his termination, the Plaintiff has established that he was a member of the protected class, age forty and over, that he was qualified for the position of sales associate, and that he was terminated. The Plaintiff cannot, however, meet the fourth element of his prima facie case, as he was replaced by a forty-three year old individual.. Summary judgment must be granted

---

**9.** The Plaintiff's date of birth is December 5, 1944.

to the Defendant on this portion of the Plaintiff's age discrimination claim.

### C. *Public Policy under Ohio Law.*

 "To state a claim of wrongful discharge in violation of public policy, a plaintiff must allege facts demonstrating that the employer's act of discharging him contravened a 'clear public policy.' " *Painter v. Graley,* 70 Ohio St.3d 377, 639 N.E.2d 51 (1994) (syllabus). That "clear public policy" can be based on statutes, the Constitution of Ohio and the United States, administrative rules and regulations and the common law. *Painter,* 639 N.E.2d at 51 (syllabus); *see also Collins v. Rizkana,* 73 Ohio St.3d 65, 652 N.E.2d 653, 657–60 (1995) (holding that a cause of action may be brought for wrongful termination in violation of public policy based on sexual harassment and discrimination).

Because the Plaintiff has survived summary judgment on the issues of handicap and age discrimination, the Plaintiff also survives summary judgment on his public policy claim which is based on his wrongful demotion and discharge in violation of Ohio Revised Code Chapter 4112.[10]

### V. CONCLUSION

For the above reasons, the Defendant's Motion for Summary Judgment on the claim of handicap discrimination and his claim of age discrimination as it pertains to his demotion under Ohio Revised Code Chapter 4112 is **DENIED**. The Defendant's Motion for Summary Judgment on the issue of age discrimination with respect to the Plaintiff's termination is **GRANTED**.

**IT IS SO ORDERED.**

---

**10.** This claim was not specifically plead in the complaint and not argued in Defendant's motion for summary judgment. However, the claim was argued in the Plaintiff's Response.