**Diane R. KITTLE, Plaintiff,**

v.

**CYNOCOM CORP., Defendant.**

**Case No. C2–01–368.**

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 22, 2002.

Russell Allen Kelm, Law Offices of Russell Kelm–2, Columbus, OH, for Plaintiff.

David Anthony Kadela, Littler Mendelson PC–2, Columbus, OH, for Defendant.

## ORDER AND OPINION

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on Cynocom Corp's ("Defendant") Motion for Summary Judgment. For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED.**

### II. FACTS

Because this matter is before the Court on Defendant's Motion for Summary Judgment, the Court views the facts in the light most favorable to Plaintiff.

Cynocom Corp. ("Defendant") is a privately owned Florida corporation that provides Internet-based software applications. The company markets and develops iAsyst, an Internet based software solution designed to automate an organization's customer service and internal operations. John Calvert, Luis Venegas, John Wilson, and Richard Adrey founded the company, originally under a different name, in 1999. Calvert was the chief technology officer and had developed the technology the company planned to market. Venegas was the vice president of operations, Wilson was the chief executive officer, and Adrey was the chief financial officer.

In 1999, Wilson developed a relationship with Paul Corrigan, a consultant in Columbus, Ohio. Corrigan had contacts with government agencies and large commercial enterprises in the Columbus and Washington, D.C., areas. In order to market iAsyst to these agencies and enterprises, Corrigan suggested that Defendant hire someone in the Columbus area to develop Corrigan's leads. Corrigan suggested Diane R. Kittle ("Plaintiff") for the job.

In December 1999, Defendant hired Plaintiff as its Director of Enterprise and Government Business at a salary of $115,000. Plaintiff was to work out of her home in Columbus and report to Wilson in Florida. At the time, Defendant envisioned two markets for iAsyst: the reseller market and the direct sales market. Plaintiff was hired to develop the direct sales market by developing Corrigan's leads to government agencies and commercial enterprises in Columbus and Washington, D.C. Upon Plaintiff's recommendation, Defendant hired Sasha Mossman, Plaintiff's niece, as Director of Advance Information Technology to assist Plaintiff. In March 2000, Defendant hired John Calia as its Vice President of Sales and Marketing. At that time, Plaintiff began to report to Calia instead of Wilson.

During Plaintiff's tenure as Director of Enterprise and Government Business, she gave presentations to companies and attended conventions in an attempt to develop business for Defendant. Plaintiff followed the leads of Corrigan, but ultimately those leads did not lead to any sales. During her ten months of employment, Plaintiff did not make a single sale. Her failure to make any sales was not entirely her fault. In the spring of 2000, Defendant realized that iAsyst would require further development and that it was not ready for customer use. In fact, iAsyst was not ready until after Defendant terminated Plaintiff. John Calia admits that Plaintiff's inability to make sales was due to problems with Defendant's product and the lack of a product to sell.

Nevertheless, Defendant's officials were frustrated that Plaintiff was unable to

make any sales. John Calvert, for example, spent significant time pursuing leads with Plaintiff that did not lead to sales. On two occasions, Calvert flew to attend meetings with Plaintiff and potential customers only to learn that the decision makers at the prospective clients did not have the meetings on their calendars.

Shortly after John Calia was hired in March 2000, Wilson and Calvert advised him that they were ready to eliminate Plaintiff's position because they did not think the direct sales program was working. Calia, however, requested a ninety day period to evaluate Plaintiff's efforts.

Calia ultimately found Plaintiff difficult to work with. She frequently complained to Calia and complained about Calia to other officers of Defendant. On one occasion, Plaintiff became mad because Calia had contacted someone he knew at one of Plaintiff's potential clients without mentioning this contact to Plaintiff. Likewise, Plaintiff complained about the amount of time it took Defendant to hire a new assistant when Mossman left the company in June 2000.

At the conclusion of Calia's ninety day evaluation period of Plaintiff, Calia and Wilson were ready to terminate the Ohio operation. Adrey, however, convinced them to wait and see if either of the two leads Plaintiff was developing at the time would lead to sales.

In May of 2000, Plaintiff suffered from two transient ischemic attacks, which are stroke-like attacks. During these two attacks, Plaintiff experienced a blind spot in one or both of her eyes. After these attacks, Plaintiff was able to perform her regular job functions. Plaintiff and others referred to these attacks as "strokes."

In October of 2000 Plaintiff told John Wilson about her strokes. They had this conversation shortly before an October 25, 2000 business trip to Washington, D.C., to meet with a prospective client. Wilson attended the October 25 meeting and met with Plaintiff and her new assistant, Heather Glenn,[1] for breakfast on the morning of the meeting. During this breakfast meeting, Wilson asked Plaintiff questions about her medical condition. He asked Plaintiff if she was embarrassed by the stroke, if she could walk and talk, if she could remember things, and if she could conduct the meeting with the prospective client. Wilson's former wife had suffered a brain aneurysm that caused more significant and debilitating symptoms than Plaintiff suffered from her strokes. About a week before the October 25 meeting, Wilson had a telephone conversation with Glenn in which he told Glenn that he did not want Plaintiff to travel to Washington due to her medical condition. Wilson also told Glenn about the symptoms his former wife had suffered from her brain aneurysm. John Calia learned about Plaintiff's strokes at about the same time that Wilson did, and Calia also did not want Plaintiff to travel to Washington for the October 25 meeting.

On October 26, 2000, the day after Plaintiff, Glenn, and Wilson returned from their meeting in Washington, Calia sent Plaintiff an e-mail message requesting that she refrain from working until she obtained a written release from her physician declaring her fitness to return to work. Although Plaintiff obtained the medical re-

---

1. Both Heather Glenn and Plaintiff's first assistant, Sasha Mossman, are Plaintiff's nieces. When Defendant hired these assistants, on Plaintiff's recommendations, it did not know that they were related to Plaintiff. Plaintiff made certain revisions to Glenn's resume including adding information about her education that was untrue. But these facts are not relevant because Defendant only learned about them during the course of this litigation. Therefore, they could not have been the reason that Defendant terminated Plaintiff.

lease, she was terminated on October 27, 2000 even before she was able to deliver the release to Defendant.

In September 2000, Defendant had learned that iAsyst was still not ready for deployment to customers. The company sought ways to reduce its spending. Calia proposed the elimination of the Ohio direct sales operation as one means of reducing costs within his department. The Ohio operation was expensive because Defendant paid Plaintiff $115,000 per year and paid her assistant Glenn $50,000 per year. The costs of travel to meet with prospective clients were also high. Wilson and others at Defendant determined that none of Plaintiff's prospective clients were strong prospects and that Defendant should focus on the reseller market and eliminate its costly and fruitless direct sales efforts.

At the same time that Defendant terminated Plaintiff's position, Defendant also terminated Plaintiff's assistant, Glenn. Defendant did not replace Plaintiff with a new employee, but rather eliminated Plaintiff's position altogether. Over the following two months, Defendant terminated four additional employees. Although the company once employed 31 people, it now employs only nine, including two of the founders who have been deferring their salaries since November 2000.

## III. PROCEDURAL HISTORY

Plaintiff filed her Complaint and Jury Demand with this Court on April 20, 2001. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of Ohio and Defendant is a Florida corporation with its principal place of business in Florida. The amount in controversy is in excess of $75,000.

Plaintiff's Complaint alleges two claims. Count One alleges wrongful termination based on disability in violation of Ohio Revised Code sections 4112.01(A)(13), 4112.01(A)(16), 4112.02(A), and 4112.99. Count Two alleges age discrimination in violation of Ohio Revised Code sections 4112.02(I) and 4112.99. By stipulation of both parties, Plaintiff's Count Two was dismissed with prejudice on July 1, 2002, leaving only her disability discrimination claim.

Defendant filed a Motion for Summary Judgment on June 4, 2002. The Court now decides that motion.

## IV. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is ap-

propriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## V. ANALYSIS

### A. Court's "Subject Matter Jurisdiction"

■ Defendant's first contention is that this Court lacks subject matter jurisdiction over Plaintiff's disability discrimination claim because the relevant provisions of Ohio Revised Code do not apply to Defendant because Defendant has never employed four or more employees in the state of Ohio. Indeed, Ohio Revised Code Section 4112.01(A)(2) defines an employer as any person or entity "employing four or more persons within the state." Ohio Rev. Code Ann. § 4112.01(A)(2) (West 2001). Therefore, because Defendant has never employed four or more persons within Ohio, Plaintiff cannot bring a statutory claim for disability discrimination against Defendant.

But Plaintiff's lack of a statutory claim does not mean the court lacks subject matter jurisdiction. Rather, this Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1332 diversity jurisdiction.

Although Plaintiff does not have a statutory claim against Defendant, Plaintiff does have a public policy tort claim against Defendant. Plaintiff's Complaint alleges that "Plaintiff was wrongfully terminated by Defendant because of her disability or perception of a disability by Defendant in violation of [Ohio statute] for which Plaintiff seeks [damages]." The Court finds that this language is sufficient to state a public policy wrongful termination tort claim.

■ The Ohio Supreme Court has specifically decided that a public policy wrongful termination tort claim can be premised upon Ohio employment discrimination statutes where the defendant employer employs fewer than four people in the state. *See Collins v. Rizkana*, 73 Ohio St.3d 65, 652 N.E.2d 653, 660–61 (1995). Specifically addressing sexual discrimination, the court in *Collins* decided that it could not "interpret [Ohio Revised Code section] 4112.01(A)(2) as an intent by the General Assembly to grant small businesses in Ohio a license to sexually harass/discriminate against their employees with impunity." *Id.* Rather, the Court found that although employers of fewer than four people in the state may be exempt from the requirements of Ohio Revised Code chapter 4112, they are not exempt from the antidiscrimination policy set forth in those statutes. *Id.*

### B. Public Policy Claim

■ Although employment relationships in Ohio are generally governed by the common-law doctrine of employment at will, Ohio law recognizes "a cause of action in tort for wrongful discharge in violation of public policy." *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 773 N.E.2d 526, 529 (2002) (plurality opinion). The Ohio Supreme Court has identified four elements of this tort:

1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element)[;]

2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element)[;]

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element)[; and]

4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Collins v. Rizkana,* 73 Ohio St.3d 65, 652 N.E.2d 653, 657–58 (1995); *see also Wiles,* 773 N.E.2d at 529–30. The clarity and jeopardy elements are questions of law, while the causation and overriding justification elements are questions of fact. *Collins,* 652 N.E.2d at 658; *see also Wiles,* 773 N.E.2d at 530. Specifically, as in this case, Ohio "public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." *Greeley v. Miami Valley Maint. Contractors, Inc.,* 49 Ohio St.3d 228, 551 N.E.2d 981, 986 (1990).

██ Because Plaintiff's disability discrimination claim is based only on a violation of Ohio public policy, the Court must analyze Plaintiff's claim under the four *Collins* elements. The parties in this case, however, do not analyze Plaintiff's claim under these four elements. Rather, they analyze the claims under the elements for a disability discrimination claim under Ohio statutes. The difference, however, amounts to little more than a difference in semantics. In fact, Ohio courts will look to see whether a plaintiff has grounds for relief under the Ohio antidiscrimination statutes in determining whether defendants have violated Ohio public policy. *See Cochran v. Columbia Gas of Ohio, Inc.,* 138 Ohio App.3d 888, 742 N.E.2d 734, 740 (2000) (finding that because a plaintiff failed to state a prima facie case under Ohio Revised Code section 4112.02, his wrongful discharge claim based solely on the public policy of that statute fails without further analysis). Therefore, the factors of a disability discrimination claim under Ohio Revised Code section 4112.02(A) are relevant to Plaintiff's public policy claim.

The first two elements of a public policy wrongful termination claim are issues of law that the parties in this case do not dispute. First, that a clear public policy exists against employment discrimination based on disability is evidenced by Ohio Revised Code section 4112.02(A). Second, this public policy would be jeopardized if Defendant terminated Plaintiff based on a disability because Plaintiff would have no other remedy against Defendant because Defendant employs fewer than four people in the state and is therefore not an employer under Ohio Revised Code chapter 4112.

██ The second two elements of a public policy wrongful termination claim are issues of fact that are similar to the elements of a disability discrimination claim under Ohio statute. For a disability discrimination claim under the Ohio statute, a plaintiff must first state a prima facie case of disability discrimination. *See Hood v. Diamond Prods., Inc.,* 74 Ohio St.3d 298, 658 N.E.2d 738, 741 (1996). A defendant may rebut a prima facie case of discrimination with evidence of a nondiscriminatory reason for the action the employer took. *Id.* If a nondiscriminatory reason is established, the plaintiff must present evidence that the nondiscriminatory reason given was merely a pretext for the real reason that the adverse employment action was taken. *Id.* at 742. These three steps correlate well with the third and fourth elements of a public policy tort claim. The first step, the establishment of a prima facie case of discrimination, correlates with the causation element of the public policy claim. That is, to prove that Plaintiff's termination was motivated by conduct related to the public policy, Plaintiff must set forth a prima facie case for disability discrimination. Second, the overriding justification element of the public policy tort claim correlates with the second step of the disability discrimination analysis in which Defendant may present evidence of legitimate nondiscriminatory reasons for the termination of Plaintiff.

Finally, although evidence of pretext is not an element of a public policy tort claim, just as it can serve to rebut evidence of a nondiscriminatory reason for termination for a statutory claim, evidence of pretext is also relevant to rebut evidence of a nondiscriminatory reason for termination under a public policy claim.

■ A prima facie claim for employment discrimination may be established with either direct evidence or indirect evidence. *See Mauzy v. Kelly Servs., Inc.,* 75 Ohio St.3d 578, 664 N.E.2d 1272, 1276–77 (1996). The Court will first analyze whether Plaintiff sets forth a prima facie claim of employment discrimination with either direct or indirect evidence. Second, the Court will consider whether Defendant presents evidence of valid, nondiscriminatory reasons for terminating Plaintiff. Finally, the Court will consider whether Plaintiff establishes evidence that Defendant's proffered nondiscriminatory reasons for terminating Plaintiff were merely pretext.

### C. Direct Evidence of Discrimination

Direct evidence "refers to a method of proof, not a type of evidence. It means that a plaintiff may establish a prima facie case of age discrimination directly by presenting evidence, of any nature, to show that the employer more likely than not was motivated by discriminatory intent." *Mauzy,* 664 N.E.2d at 1279. Direct evidence of discrimination may be present in the rare case where an employer says, "I fired you because you are disabled." *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir.1998). For example, in *Mauzy,* the court found that the plaintiff presented direct evidence of age discrimination where she presented evidence that her supervisor had indicated a preference for younger employees, strongly urged the plaintiff to retire, berated the plaintiff, attempted to replace plaintiff with a younger

employee, and gave plaintiff negative evaluations including the statement that "you can't teach an old dog new tricks." *Mauzy,* 664 N.E.2d at 1281. Likewise, in *McIntosh v. Stanley–Bostitch, Inc.,* 82 F.Supp.2d 775, 783 (S.D.Ohio 2000), this Court found that a plaintiff presented direct evidence of disability discrimination where the employer told the plaintiff that he was being demoted due to his health problems.

■ Plaintiff in this case contends that the comments Wilson and Calia made to her about her strokes constitute direct evidence of disability discrimination. According to Plaintiff, Wilson's questions at breakfast before the October 25, 2000 meeting in Washington, D.C., "clearly went beyond a general concern for Kittle's health." These comments, however, only serve to demonstrate that Wilson and Calia were aware of Plaintiff's strokes and were concerned for her health. Plaintiff contends that they were "clearly related" to the decision to terminate her because the comments were made just two weeks before she was terminated. This is the only evidence that Plaintiff has to link these comments to Defendant's decision to terminate her. These facts are insufficient to demonstrate that the employer was more likely than not motivated by discriminatory intent. Unlike in *Mauzy* or *McIntosh,* Defendant never told Plaintiff that they were taking adverse action against her due to her disability.

### D. Indirect Evidence of Discrimination—The Prima Facie Case

■ Because direct evidence of discrimination is often unavailable, a plaintiff may set forth a prima facie case of disability discrimination using indirect evidence. To establish a prima facie case of discrimination plaintiff must "demonstrate (1) that

he or she was [disabled], (2) that an adverse employment action was taken by an employer, at least in part, because the individual was [disabled], and (3) that the person, though [disabled], can safely and substantially perform the essential functions of the job in question."[2] *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 697 N.E.2d 204, 206 (1998); *Hood v. Diamond Prods., Inc.*, 74 Ohio St.3d 298, 658 N.E.2d 738, 741 (1996); *Miller v. Premier Indus. Corp.*, 136 Ohio App.3d 662, 737 N.E.2d 594, 599 (2000). Defendant claims that another element of the prima facie case is that Plaintiff be replaced by a nondisabled employee. The cases that Defendant cites for this element, however, are based on federal law, not state employment law. Although courts may look to analogous federal cases and statutes in interpreting Ohio employment discrimination statutes, *see, e.g., McGlone*, 697 N.E.2d at 206–07, such cases do not overrule well-established Ohio case law such as the elements of a claim for disability discrimination.[3]

With respect to the first element of Plaintiff's prima facie case, she does not contend that she was disabled when she was terminated, but rather she alleges that she was regarded as disabled. Defendant contends that there is no evidence that anyone regarded Plaintiff as disabled; rather, various officers of Defendant asked Plaintiff about her health because they were concerned about her.

■■■■ Indeed, a person need not in fact be disabled, but must only be regarded as disabled by her employer to be protected by Ohio employment discrimination law. *See McGlone*, 697 N.E.2d at 206. To predicate a claim on a notion of "regarded as" disability, Plaintiff must establish that Defendant perceived her as foreclosed "from a class of jobs," not just foreclosed from performing her particular job. *Id.* at 207; *Wiegerig v. Timken Co.*, 144 Ohio App.3d 664, 761 N.E.2d 118, 124 (2001) (citing *McGlone*). Although the fact that an employer regarded an employee as foreclosed from a class of jobs is hard to prove, such a question of motive "is one rarely susceptible to resolution at the summary judgment stage." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir.2001). In *Ross*, the court found that summary judgment was not appropriate where a plaintiff presented evidence that his employer regarded him as a "back case," thereby creating "a genuine issue of material fact that [defendant] regarded [plaintiff] through the lens of his medical condition." *Id.* at 707.

**2.** The current statutory term is "disability," but before 2000 the term was "handicap." *See* Ohio Rev.Code Ann. §§ 4112.01(13), 4112.02(A) (West 2001).

**3.** During oral argument, Defendant suggested that the Court should follow its reasoning in *Williams v. Emco Maier Corp.*, 212 F.Supp.2d 780 (S.D.Ohio 2002). In *Williams*, this Court considered a reduction in force case. When an employee is terminated as part of a reduction in force ("RIF"), her duty to present a *prima facie* case is somewhat heightened. *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir.1991) (citing *Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1986)). In RIF cases, the terminated employee must present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990). Because Defendant in this case eliminated its entire direct sales operation due to financial difficulties, this case could be considered a RIF case and require a heightened standard for a *prima facie* case.

Defendant, however, did not allege that this is a RIF case in its Motion for Summary Judgment; therefore, Plaintiff did not have an opportunity to respond to this argument. For this reason, the Court will not evaluate this case under the RIF standard.

■ As evidence that Defendant regarded Plaintiff as disabled, Plaintiff relies on the comments Wilson and Calia made to Plaintiff when they learned about her strokes. Based on Wilson's knowledge of his former wife's experience with a brain aneurism, he thought that this kind of condition could be permanently debilitating. Defendant argues, however, that Wilson and Calia never perceived Plaintiff as disabled because she was able to perform her job and she assured them that she was alright. After meeting with Plaintiff for breakfast on October 25, 2000, Wilson would have known that Plaintiff had not suffered the same kind of symptoms as his former wife had suffered.

Nevertheless, given the fact that Wilson and Calia wanted Plaintiff to stop traveling to prospective clients, and given Wilson's many questions about Plaintiff's condition, Plaintiff establishes a genuine issue of material fact as to whether Defendant perceived her as disabled. As the *Ross* court found, whether an employer viewed an employee through the "lens" of her medical condition is a question of fact rarely susceptible to resolution on a motion for summary judgment. Given the questions and comments of Wilson and Calia, and their instruction to Plaintiff to stop traveling and obtain a medical release, there is a genuine issue of material fact about whether Defendant perceived Plaintiff as disabled.

To satisfy the second element of a prima facie case of disability discrimination, Plaintiff must demonstrate that she was terminated at least in part because of her perceived disability. In this case, the timing of Defendant's decision to terminate Plaintiff is sufficient to create a genuine issue of material fact about whether Defendant terminated Plaintiff, at least in part, because of her recent strokes. Defendant terminated Plaintiff within two weeks of learning and inquiring about Plaintiff's health condition. Defendant contends that it did not terminate Plaintiff, even in part, because of her health condition, but terminated Plaintiff for valid business reasons. Although evidence of a valid business justification for Plaintiff's termination is relevant, Plaintiff need not rebut this evidence in stating her prima facie claim. Rather, the Court will consider this evidence as Defendant's rebuttal of Plaintiff's prima facie case in Part E, *infra*, of this Opinion.

Finally, Defendant does not contest the third element of Plaintiff's prima facie claim of disability discrimination, namely, that Plaintiff could perform the essential functions of her job. Therefore, Plaintiff has presented enough evidence to establish a prima facie claim of disability discrimination.

## E. Defendant's Rebuttal Evidence

■ Once Plaintiff establishes a prima facie case of discrimination, the burden shifts to Defendant to establish "some legitimate, nondiscriminatory reason" for terminating Plaintiff. *Hood v. Diamond Prods., Inc.*, 74 Ohio St.3d 298, 658 N.E.2d 738, 741 (1996); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 421 N.E.2d 128, 132 (1981). Defendant proffers two main nondiscriminatory reasons for terminating Plaintiff. First, Plaintiff was unsuccessful and ineffective in her position as Director of Enterprise and Government Business. She never made a single sale. Calia and Wilson found her difficult to work with. Second, Defendant had spent most of its money and still did not have a product ready for delivery to customers in September 2000. The company needed to reduce spending. Eliminating its unsuccessful direct sales operation was one way to reduce spending. At the time, Plaintiff was the highest paid employee of Defendant, with a salary of

$115,000 per year. Defendant paid Plaintiff's assistant $50,000 per year. Travel expenses for the duo were costly, especially considering that they did not make any sales. Furthermore, Defendant determined that focusing on sales to retailers would be more successful and cost efficient than Plaintiff's direct sales attempts. All of these reasons are sufficient nondiscriminatory reasons for terminating Plaintiff.

### F. Plaintiff's Evidence of Pretext

■ Because Defendant offers evidence of nondiscriminatory reasons for terminating Plaintiff, the burden of production shifts back to Plaintiff to present evidence that Defendant's proffered nondiscriminatory reasons for termination were pretextual. *Hood v. Diamond Prods., Inc.*, 74 Ohio St.3d 298, 658 N.E.2d 738, 742 (1996); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 421 N.E.2d 128, 132 (1981). To demonstrate pretext, Plaintiff must "show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [her] discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir.1993)).

Plaintiff does not deny that Defendant's nondiscriminatory reasons for terminating her are true or that they would be sufficient to motivate termination. Rather, she argues that Defendant's proffered reasons were not the real reasons she was terminated and that she was terminated because Defendant regarded her as disabled. Plaintiff argues that Defendant could have terminated her for all of its proffered nondiscriminatory reasons for months, but instead terminated her within two weeks of learning of her health condition.

Following the reasoning of *Manzer*, the Court considers whether Plaintiff presents evidence "to indict the credibility of [her] employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Manzer*, 29 F.3d at 1084. To meet this burden, the Plaintiff must present additional evidence beyond that required to support its prima facie case of discrimination. *Id.* In *Manzer*, the court rejected plaintiff's argument that defendant's reasons for terminating him were pretextual because he had continued to receive positive reviews even after the incidents that defendant cited as the reasons for terminating him. *Id.* at 1085. In other words, the fact that defendant could have terminated plaintiff for nondiscriminatory reasons before it did is not enough to prove that the reasons defendant gave for the termination are pretextual. *Id.* at 1085–86.

In this case, Plaintiff makes several arguments that Defendant's reasons for terminating her are pretextual. Her principal argument is that the timing of Defendant's decision to terminate her demonstrates that its reasons are pretextual. Defendant decided to terminate Plaintiff within two weeks of learning about Plaintiff's strokes. Plaintiff argues that all the nondiscriminatory reasons Defendant offers for why she was terminated existed for months before she was in fact fired, and she was only terminated after Defendant learned of Plaintiff's strokes. But as the court in *Manzer* decided, the fact that Defendant could have terminated Plaintiff for nondiscriminatory reasons before it did does not prove that those reasons were pretextual. Rather, Plaintiff must present some additional evidence of discriminatory intent.

Plaintiff further argues that the reasons for her discharge are pretextual because

although the Ohio direct sales operation was not successful, its failure was not entirely her fault because Defendant's software product was not available for delivery to clients. Plaintiff also notes that none of Corrigan's leads proved useful. But the fact that Plaintiff failed in her job due to no fault of her own does not demonstrate that Defendant terminated her for discriminatory reasons. Rather, Defendant was entitled to terminate Plaintiff if the company could no longer afford to retain her and if she was not making any sales.

Plaintiff also argues that Defendant's explanation that she was difficult to work with is pretextual because it is not unreasonable that Plaintiff would have been displeased by certain things that Calia did and that all employers have difficult employees. Once again, this argument does not evidence discriminatory intent. Rather, if Plaintiff was difficult to work with, Defendant had a nondiscriminatory reason to terminate her.

Finally, Plaintiff presents no evidence to suggest that Defendant's proffered reasons for terminating her are pretextual because at the same time that Defendant terminated Plaintiff, it also terminated Plaintiff's assistant. Defendant did not replace Plaintiff with another employee; rather, Defendant completely eliminated Plaintiff's position and its direct sales operation. Over the next two years, Defendant laid off numerous other employees. Although replacement by another employee is not an element of Plaintiff's prima facie case, the fact that Defendant did not replace Plaintiff is evidence that Defendant's reasons for terminating Plaintiff are not pretextual. That is, Defendant fired Plaintiff because it could no longer afford to fund its fruitless direct sales efforts, and Defendant did not resume these efforts with another employee.

Therefore, Plaintiff does not meet her burden of showing that Defendant's proffered nondiscriminatory reasons for terminating her were pretextual because she fails to present evidence beyond her prima facie case to demonstrate that Defendant in fact terminated her for discriminatory reasons, nor does Plaintiff demonstrate that Defendant's reasons were untrue or constituted insufficient grounds for termination.

## VI. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**