NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0089n.06

Case No. 16-3559

FILED
Feb 02, 2017
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NATHAN HICE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| DAVID J. JOSEPH COMPANY, | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: GIBBONS, COOK, and KETHLEDGE, Circuit Judges.

COOK, Circuit Judge. The David J. Joseph Company ("DJJ") fired Nathan Hice because he failed to reimburse DJJ for personal expenses charged to a company credit card, missed work, stopped responding to communications on three occasions, and lied about wrecking a company car while driving home from a bar. Hice sued, alleging that DJJ violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, and wrongfully terminated him under Ohio law. The district court granted summary judgment to DJJ, and Hice appeals. We AFFIRM.

**I. Background**

**A. Hice's Work History**

In 2006, Hice began working as a broker at DJJ, a company specializing in scrap-metal recycling. Approximately one year into his employment, he crashed a company car while

leaving a bar, fled the scene of the accident, and falsely reported to the police that the car had been stolen. Despite these errors in judgment, DJJ gave him a second chance.

In 2011, Hice voluntarily left DJJ for another company. His departure upset Rob Angotti, the Executive Vice President of DJJ's Brokerage and Services Group, because Hice quit without "adequate or appropriate notice." Within weeks, however, Hice asked for his job back. Although Angotti did not want to rehire him, he left the decision up to the brokerage team, which voted to bring Hice back "[b]ecause [it] was short staffed."

Upon his return, Hice was supervised by Mark Bonner. Bonner testified that by 2013, Hice's work quality had declined markedly due to absenteeism and a lack of responsiveness to work emails, phone calls, and text messages. His lackluster performance persisted despite complaints from suppliers and customers, his supervisors' warnings, and Hice's understanding that responsiveness and time in the office were crucial to his job responsibilities.

Bonner highlighted three specific "no-call [or] no-show" days over a six-and-a-half-month span in 2013. The first occurred on February 13, when Hice failed to respond to Bonner's calls or text messages the day after an industry event. When Bonner finally reached Hice in the late afternoon, he insisted that Hice promptly return his calls and messages in the future and give notice if he needed time off.

Then, on June 20, Hice skipped a company photoshoot without notifying anyone ahead of time that he would be absent. Hice only contacted DJJ after Karen Luther, a HR director, emailed Hice to learn his location. Hice then spoke with Bonner—who had unsuccessfully attempted to contact him throughout the day—and explained "that he was up all night with a family member who was ill." Bonner reiterated the need for prompt notice.

Hice missed work again on Friday, August 23. Like before, Bonner was unable to reach Hice until almost 4 p.m., when Bonner received an email from him requesting unpaid leave because he "had some pressing issues that [he] needed to deal with." Fed up with Hice's absenteeism and unresponsiveness, Bonner resolved to speak with Luther the following Monday about terminating Hice.

## B. Hice's Stalker Problem

Before Bonner could raise the termination issue, Hice met with Luther on Monday morning and detailed the "pressing issues" from the previous Friday. In early July, Hice had tried to break off a romantic relationship with a woman who was also the sister-in-law to one of Hice's supervisors. Not wanting their relationship to end, the woman began making "uninvited and unwelcome" appearances at his house and sending him rambling, sometimes threatening, text messages. Hice called the police twice, but she continued her harassment. Hice's expert witness testified that this stalking exacerbated Hice's longstanding anxiety disorder and led to his developing post-traumatic stress disorder.

During the week leading up to Friday, August 23, Hice received "threatening" text messages from the woman and from several unidentified numbers. Around midnight on Thursday, a coworker called Hice to express concern about "the situation with [the woman]." Fearing for his life, Hice called the police and a helpline provided by DJJ. As advised by the helpline operator, he drove to his parents' house to stay the night and emailed Bonner later to notify him of the incident. He also emailed Luther to schedule a Monday-morning meeting to discuss why he had missed work.

During the meeting with Luther, Hice detailed the events of Thursday night and his need to obtain a restraining order. Luther brought Bonner in halfway through the meeting, and they both expressed concern for Hice's safety. Afterward, Hice returned to work.

### C. Hice's Termination

The next day, Rob Angotti overheard a conversation between Bonner and Terry Rath, a DJJ Vice President and Bonner's supervisor, about Hice's work performance. In addition to learning about Hice's unresponsiveness and spate of absences, Angotti found out he had charged personal expenses to the company's American Express card without reimbursing DJJ. Rath had warned Hice that company policy prohibited employees from charging personal expenses to the card.

Angotti immediately decided to fire Hice. Given Hice's checkered past, Angotti considered the improper expenses on the company credit card his third strike (counting his car crash and his leaving DJJ in 2011 as the first two). Angotti had no knowledge of Hice's harasser, nor did Rath or Bonner advise him to fire Hice.

Under Angotti's direction, Bonner and Luther terminated Hice that afternoon. Bonner originally took back a company iPhone, but Hice asked to hold onto it and an iPad because they contained messages and a video that he would need as evidence to obtain the restraining order. Bonner agreed on the condition that he return both after the restraining-order hearing. Although Hice secured the order several days later, he did not return either device.

### D. Hice's Lawsuits

In February 2014, Hice sued DJJ in state court, alleging wrongful termination in violation of Ohio public policy. DJJ filed counterclaims asserting conversion of the iPhone and iPad and unjust enrichment for failure to repay the personal charges on the company card. Hice responded

by voluntarily dismissing his wrongful termination suit. The state court then found Hice liable on DJJ's counterclaims and ordered Hice to return the electronics and reimburse the credit card expenses.

In August 2015, Hice filed a second suit, this time in federal district court. He alleged that DJJ violated the FMLA when it failed to provide him FMLA leave for missing work on August 23 and that it contravened Ohio public policy by firing him for seeking a temporary restraining order. DJJ moved for summary judgment on both claims. The district court ruled in DJJ's favor, holding that Hice's claims were compulsory counterclaims to DJJ's prior unjust enrichment and conversion actions, and therefore Hice's failure to raise them in the state court case precluded him from litigating them in federal court. Alternatively, it held that Hice failed to establish a prima facie case for either his FMLA or wrongful termination claims. Hice timely appealed.

## II. Compulsory Counterclaims

We review de novo the district court's grant of summary judgment. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000)). "Summary judgment is appropriate if, after examining the record and drawing all inferences in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 575 (6th Cir. 2007) (quoting *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004)).

Hice argues that the district court erred when it held that his FMLA and wrongful termination claims were "compulsory counterclaims" to DJJ's prior conversion and unjust enrichment claims. We discern no error.

To determine whether a claim is compulsory, Ohio courts ask: "(1) does the claim exist at the time of serving the pleading"; and "(2) does the claim arise out of the transaction or occurrence that is the subject matter of the opposing claim." [1] *Geauga Truck & Implement Co. v. Juskiewicz*, 457 N.E.2d 827, 829 (Ohio 1984); *see also* Ohio R. Civ. P. 13(A). If a party fails to raise a compulsory counterclaim in an initial suit, res judicata bars that party from raising it in any subsequent action. *See Rettig Enters., Inc. v. Koehler*, 626 N.E.2d 99, 102 (Ohio 1994) (citing *Juskiewicz*, 457 N.E.2d at 829). Hice concedes that his claims existed at the time DJJ sued him for unjust enrichment and wrongful termination and challenges only the district court's holding that his "claims arise out of the same transaction or occurrence." *Id.* at 103 (internal quotation marks and citations omitted).

To assess whether a claim arises out of the same transaction or occurrence, Ohio courts use the "logical-relation" test. *Id.* "[A] compulsory counterclaim . . . is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts." *Id.* (alteration in original) (internal quotation marks and citation omitted). Put another way, "claims are compulsory . . . where they 'involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties.'" *Id.* (quoting *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961)).

---

[1] Because the original claim arose in Ohio state court, Ohio Rules of Civil Procedure govern whether Hice's claims are compulsory. *See* 3 Daniel R. Coquillette et al., *Moore's Federal Practice - Civil* § 13.14 (2016) ("[T]he effect in subsequent federal litigation of the failure to raise a claim in state court is governed by the state court's compulsory counterclaim rule, not by [Federal] Rule 13.").

Applying the logical-relation test to the facts here, we find that Hice's FMLA and wrongful-termination claims "are offshoots of the same basic controversy" as DJJ's past claims. *Id.* (quoting *Great Lakes Rubber Corp*, 286 F.2d at 634).

First, to succeed on its unjust enrichment claim, DJJ had to show that: (1) Hice received a benefit when he charged personal expenses to the company card without reimbursing DJJ; (2) Hice knew that he was receiving this benefit; and (3) Hice failed to repay the personal charges and interest he incurred. *See Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984). Those same facts intertwine with Hice's FMLA and wrongful termination claims because to succeed on either, he needed to show that one of DJJ's reasons for firing him—Hice's abuse of the credit card—was pretextual. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 761–62 (6th Cir. 2012) (applying the *McDonnell Douglas* burden-shifting framework to FMLA claims); *Kittle v. Cynocom Corp.*, 232 F. Supp. 2d 867, 874–75 (S.D. Ohio 2002) (noting that although not an element of a tort for wrongful termination in violation of public policy, "evidence of pretext is . . . relevant to rebut" the causation element). In other words, Hice's failure to pay off his credit card expenses constitutes one of DJJ's defenses to Hice's current claims *and* the heart of DJJ's prior unjust enrichment claim. *See Long v. Welch & Rushe, Inc.*, 28 F. Supp. 3d 446, 451–55 (D. Md. 2014) (holding that an employee's Title VII claim was compulsory to an employer's unjust-enrichment action because the employer asserted that it fired her for failing to repay personal expenses charged to the company card).

Similarly, Hice's wrongful-termination claim shares essential facts with DJJ's claim for conversion of the iPad and iPhone. Hice alleges that DJJ wrongfully terminated him for "seeking a protective order against [a supervisor's] sister-in-law," thereby violating Ohio's public policy of protecting stalking victims. To prove conversion, however, DJJ needed to

establish the point at which Hice exercised wrongful control over the iPad and iPhone; to do that, it needed to explain that it initially allowed Hice to keep the devices temporarily *to facilitate* his obtaining a protective order, but that Hice never returned them as agreed. *See Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.*, 493 N.E.2d 289, 292 (Ohio 1985). DJJ's cooperation in obtaining the order tends to negate Hice's argument that it intended to thwart his restraining-order efforts. *See Dohme v. Eurand Am., Inc.*, 956 N.E.2d 825, 829 (Ohio 2011) (requiring as one of the elements of a wrongful-termination-in-violation-of-public-policy claim that the plaintiff prove the "dismissal was motivated by conduct related to the public policy").

Hice's sole rebuttal consists of trying to squeeze his facts into the framework of *Wilson v. Jo-Ann Stores, Inc.*, No. 26154, 2012 WL 2337251 (Ohio Ct. App. June 20, 2012), a case in which a state appellate court held that the employees' claims of unlawful discrimination and retaliatory discharge were not compulsory counterclaims to their employer's prior replevin action. Despite Hice's efforts, he fails to dissuade us from viewing his claims as compulsory.

In *Wilson*, employees sued Jo-Ann Stores for unlawful discrimination and retaliatory discharge. *Id.* at *1. Shortly thereafter, Jo-Ann Stores learned that the employees had kept hundreds of company documents after they were fired. *Id.* It filed a replevin claim, and the employees returned the documents. *Id.* The employees then voluntarily dismissed both their claims without prejudice. *Id.* The trial court granted default judgment to Jo-Ann Stores on its replevin action, awarding damages for expenses associated with filing the claim. *Id.*

The employees later brought a second suit reprising the same claims. *Id.* Jo-Ann Stores moved for summary judgment, arguing that res judicata barred the employees from raising the claims because they constituted compulsory counterclaims to its previous replevin claim. *Id.* The trial court granted summary judgment in favor of Jo-Ann Stores, but the appellate court

reversed. *Id.* at *5. It reasoned that (a) the unlawful discrimination and retaliatory discrimination claims "lack[ed] even the slightest resemblance" to any of the elements of the replevin claim, *id.* at *3, and (b) the replevin claim could be resolved without reference to the facts or legal issues stemming from the employees' claims, and vice versa, *id.* at *4–5.

In asking us to reach the same result in his case, Hice parrots the language of *Wilson*, recasting DJJ's conversion and unjust-enrichment claims as a replevin claim. He then highlights the dissimilarities between the (now-labeled) replevin claim and the elements of his FMLA and wrongful-termination claims. Finally, he argues that DJJ would have brought its "replevin" claim regardless of whether he brought his FMLA and wrongful-termination claims.

Hice's arguments fail for two reasons. First, the state court record shows that DJJ brought unjust enrichment and conversion claims, and Hice never challenged that characterization in either the state or federal proceedings. But even if Hice were correct in shoehorning DJJ's claims into a replevin claim, the question of whether opposing claims share overlapping elements matters less than whether a "sufficient legal or factual nexus" exists. *Sherman v. Pearson*, 673 N.E.2d 643, 646 (Ohio Ct. App. 1996) ("The difference in the nature of the actions is not paramount; rather, the issue is whether the two claims have a sufficient legal or factual nexus to satisfy the 'logical-relation' test.").

Second, when turning to the "legal or factual nexus," Hice omits critical portions of the *Wilson* court's reasoning. For example, the *Wilson* court contrasted its facts to a situation where "[e]mployees [are] discharged *because* they wrongfully retained documents." *Wilson*, 2012 WL 2337251, at *4 (emphasis added). The counterfactual parallels the facts here, where DJJ fired Hice in part because he failed to pay back credit card charges. Additionally, the *Wilson* court pointed out that the "[e]mployees' claims could be resolved without any regard for the resolution

of the replevin claim." *Id.* (citations omitted). The same cannot be said here, where resolution of Hice's claims turns on whether Hice owed and repaid credit card expenses (the subject matter of DJJ's unjust enrichment claim) and how long DJJ allowed Hice to keep the iPad and iPhone to obtain a restraining order (the subject matter of DJJ's conversion claim).

In short, allowing Hice to raise the FMLA and wrongful-termination claims in this court would duplicate the time and effort already expended in litigating DJJ's prior claims in Ohio. *See Rettig*, 626 N.E.2d at 103. Because res judicata bars Hice's claims, we need not address his argument that the district court erred when granting summary judgment for failure to state a prima facie case for either of his claims.

### III. Conclusion

For these reasons, we AFFIRM the district court's judgment.